Filed 7/7/25  P. v. Espino CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ISAK ESPINO,<br><br>    Defendant and Appellant. | D083213<br><br><br>(Super. Ct. No. SCE407562) |

APPEAL from a judgment of the Superior Court of San Diego County, Frank L. Birchak, Judge.  Affirmed with directions.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Caelle Oetting, Deputy Attorneys General for Plaintiff and Respondent.

# I

# INTRODUCTION

Isak Espino appeals a judgment of conviction after a jury found him guilty of the first degree murder of Dante Lopez (Pen. Code, § 187, subd. (a)),[1] and returned true findings on firearm enhancements associated with the murder charge (§ 12022.53, subds. (b)–(d)). Espino presents three claims of error on appeal. First, he argues the trial court exceeded its authority under state law and violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution by limiting his cross-examination of a percipient witness who identified him as the presumed killer. Second, he argues the court erroneously instructed the jury regarding its consideration of accomplice testimony. Third, he argues the abstract of judgment contains a clerical error because it states he was sentenced under the Three Strikes law when in fact the prosecution never pleaded or proved he suffered prior serious or violent felony convictions.

We agree with Espino that the trial court violated state law by restricting his cross-examination of the witness who named him as the presumed killer. However, we conclude the error of state law was harmless. We reject Espino's contention that the court violated his rights under the Confrontation Clause and conclude any instructional error was harmless. Finally, we agree with Espino that the abstract of judgment includes a clerical error requiring correction. Therefore, we affirm the judgment and direct the trial court to prepare an amended abstract of judgment deleting the checkmarks under Item 8 (which mistakenly indicate that Espino was sentenced under the Three Strikes law) and deliver the amended abstract of judgment to the Department of Corrections and Rehabilitation.

---

[1] Further undesignated statutory references are to the Penal Code.

BACKGROUND

A. *Factual Background*

One afternoon, Espino and his friends, George Gomez III and Rudy M., went to a bowling alley in Chula Vista where they bowled, drank alcohol, and played pool. While they hung out, Rudy mentioned that his older friend, Demetri H., had suffered a leg injury, was living out of his car, and was unwell. Espino and Gomez were acquaintances with Demetri and sometimes socialized with him in group settings. Rudy said he planned to give $200 to Demetri to help him out. Gomez also agreed to give $200 to Demetri, who had given money to Gomez in the past. Espino agreed to match his friends' contributions.

At 6:00 or 7:00 p.m., Espino, Gomez, and Rudy drove to a bar in Spring Valley called The View to continue drinking. Demetri joined them an hour or two later. When he arrived, he had a visible limp due to his injury and wore a leg brace that extended from his knee down to his foot.[2] Espino, Gomez, and Rudy gave Demetri the money they had pledged him—$600 in total—and the four men drank and socialized.

After about an hour, the men went to a nearby bar called Joycee's. They ordered drinks and played pool. At one point, Espino started playing pool with the victim, Lopez, who was not previously known to the four men

---

[2] At trial, Demetri testified he injured his knee a few months before the shooting and was diagnosed with a torn anterior cruciate ligament (ACL) and a torn medial collateral ligament, injuries for which he later received surgical treatment. He testified he walked with a limp for a year after his injuries and was unable to run or jog due to them. The defense called an emergency medicine expert, Dr. Ryan O'Connor, who reviewed Demetri's medical records and testified that he suffered from a torn ACL, a torn lateral collateral ligament, a peroneal nerve injury, and a strained posterior cruciate ligament.

and had come to the bar with another group of people. Meanwhile, Gomez, Rudy, and Demetri went outside the bar, smoked, and mingled.

When they returned inside, Gomez and Demetri learned that Espino had placed a bet on his pool game, lost the bet, and left the bar—ostensibly to pull out money from an ATM. However, instead of pulling out money, Espino called 911. Espino identified himself using a false name and told the operator he had played a game of pool with men at Joycee's, he had won the game, and the men had gotten angry. He said the men had pulled guns on him, threatened to shoot him, and "were chasing [him] with guns."

Back at Joycee's, Espino's companions texted and called him, but he did not answer. After a few minutes, Lopez approached Espino's companions and demanded they cover his debt, which totaled $500. Although Lopez seemed upset, he did not threaten anyone, physically touch anyone, or pull a gun on anyone. Using most of the money Demetri had been given earlier that evening, Gomez, Rudy, and Demetri paid off Espino's debt to defuse the situation. They then left the bar and drove around in search of Espino.[3]

After 15 minutes, Espino called his friends and asked them to pick him up at a nearby restaurant. When they picked him up, he initially seemed frightened and claimed Lopez had threatened him at the bar. However, he soon became angry when he learned his friends had covered his debt and wanted him to repay Demetri for the money they had given Lopez. The men returned to The View for a brief stop and Rudy separated from the group and drove home in his own vehicle.

---

[3] After Gomez, Rudy, and Demetri left Joycee's, but before Lopez was shot and killed, police officers went to the bar in response to the 911 call Espino had placed. They spoke with the bartender and Lopez, determined no argument or fight had taken place, and departed.

Thereafter, Espino arranged to borrow money from a coworker in Chula Vista to repay Demetri. Espino called the coworker and sent him a text message that read, "Do me a solid. Bring me my money." The coworker replied, "Do I bring the bitch?", which was a cloaked reference to a gun. Espino replied, "Yes, hurry." Espino, Gomez, and Demetri drove in Espino's car—a gray Lexus with black rims—to meet his coworker. Espino drove the car, Demetri sat in the front passenger seat, and Gomez sat in the backseat. After they arrived, the coworker gave $500 to Espino, who gave the money to Demetri. At trial, the coworker testified he had also planned to give Espino an unregistered Glock 17 ghost gun, but decided against it because he had a "bad feeling."[4]

Espino, Gomez, and Demetri drove to Gomez's house and dropped him off while Espino and Demetri waited outside. Gomez then walked inside and pretended to settle in for the night to appease his father, who wanted him to stay home for the evening. However, Gomez snuck out and rejoined his companions after 10 or 15 minutes. According to Gomez, he at some point noticed Espino had changed his attire from a white shirt and shorts to dark black clothing.

At trial, Gomez testified that Espino—apparently still upset his companions had paid off his debt—wanted to return to Joycee's and try to get the money back from Lopez. Gomez testified that he and Demetri tried, but failed, to talk Espino out of returning to the bar. Gomez also testified that Espino drove the group to the bar and parked around the corner.

---

[4] After his arrest, Espino spoke to his coworker from jail. During the recorded jailhouse conversation, Espino coached his coworker to lie to the police and tell them "the bitch" referred to the coworker's girlfriend, instead of a gun.

Surveillance footage obtained from a nearby resident showed a Lexus that matched the appearance of Espino's car as it parked around the corner from Joycee's minutes before the shooting. In the footage, an unidentifiable person wearing a hooded sweatshirt and dark pants can be seen exiting the driver seat of the car. The footage shows a second person—identifiable as Gomez—exiting the rear passenger seat, crossing the street, and looking around as if he were performing the role of a lookout. The footage shows the first person walking down the street in the direction of Joycee's as the second person (Gomez) returns back to the car and assumes the now-vacant driver seat. It appears there may have also been a third person seated in the front passenger seat, though the surveillance footage is inconclusive as to the presence of the possible third person.

At trial, Gomez testified that Espino was the first person who exited the driver seat, Gomez was the second person who exited the rear passenger seat, and Demetri was the purported third person who remained seated in the front passenger seat. Gomez testified he exited the vehicle to throw out a beer can, not to act as a lookout According to Gomez, Espino called to him as he crossed the street and told him to sit down in the driver seat, which he did. Gomez testified that Espino then said he would "walk by," walked down the street, and turned the street corner towards Joycee's. In the meantime, Demetri remained "half asleep" in the passenger seat.

Shortly after, at 11:15 p.m., several gunshots erupted and Lopez was shot and killed next to his car, which was parked across the street from Joycee's. The apparent shooter—who Gomez identified as Espino—ran back to the car and climbed into the rear passenger seat. According to Gomez, Espino urged Gomez to drive and told his companions it had been "perfect timing," presumably a reference to his fatal encounter with Lopez outside the

bar.  Gomez drove the men away from the crime scene back to The View, where Demetri's vehicle was parked, and Demetri then drove Gomez home.

A few days later, Espino texted the coworker from whom he had borrowed money to repay Demetri.  Espino's text included a shushing emoji— i.e., an emoji of a face with an index finger pressed to its lips—and a message that read, "Nothing to no one."  The coworker replied, "I know," and told Espino they both needed a "limpia," or cleanse.  According to Gomez, Espino also sent him a photograph of Espino's daughter on Snapchat with a message stating that he had to be there for his daughter.

The police identified Espino and Gomez as suspects and arrested them a few days later.  After the police arrested Gomez, they questioned him in a recorded interview that was played for the jury.  During the interview, Gomez initially lied and said he went home at about 10:30 p.m. and stayed there the rest of the night.  However, almost immediately afterwards, Gomez admitted he returned to Joycee's with his companions.  He also identified Espino as the person who exited the car before the shooting and came running back to the car after the shooting.

Bullets obtained from Lopez's body came from a single ghost gun, but the murder weapon was never recovered.  A search of Espino's residence uncovered a ghost gun that was not involved in the shooting.

The police swabbed several items for DNA and compared them to DNA samples obtained from Espino, Gomez, Demetri, and the victim.  Analysis of swabs from the driver's side interior door handle and seatbelt clip of Espino's car showed DNA strongly consistent with Espino and Gomez, but not Demetri.  The police also recovered a medical face mask from the ground near where the car was parked around the corner from Joycee's.  Analysis of the face mask revealed DNA consistent with Espino's DNA.

7

Cell phone records were obtained and mapped for Espino, Gomez, and Demetri. Espino's records placed him in the Spring Valley area (where Joycee's bar is located) until about 10:00 p.m., in the Chula Vista area (where Espino's coworker was located) about 15 or 20 minutes later, and then back in the Spring Valley area at 12:27 a.m. the next morning (approximately two hours later).[5] Gomez's records placed him in the Spring Valley area at 10:10 p.m. and in the Paradise Hills area (where Gomez lived) at 12:01 a.m. Demetri's records placed him in the Spring Valley area at 9:46 p.m., in Chula Vista at 10:27 p.m., and in Pacific Beach at 12:53 a.m.

B. *Procedural Background*

The district attorney charged Espino and Gomez with Lopez's murder (§ 187, subd. (a)), and alleged Espino personally and intentionally discharged a firearm proximately causing great bodily injury and death (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (*id.*, subd. (c)), and personally used a firearm (*id.*, subd. (b)) in the commission of the murder. Prior to trial, Gomez and the district attorney executed a plea agreement requiring Gomez to plead guilty to being an accessory after the fact (§ 32) and testify truthfully as a prosecution witness in exchange for the dismissal of the murder charge. As noted, Gomez testified at trial and identified Espino as the person who exited the car, walked towards Joycee's just before gunfire erupted, and ran back to the car immediately afterwards.

At the conclusion of trial, the jury found Espino guilty of first degree murder and returned true findings on the firearm enhancement allegations. The trial court sentenced Espino to state prison for an aggregate term of 50

---

[5]     An investigator from the district attorney's office discussed the cell phone records at trial and testified that Espino's records did not disclose any data usage linked to a cell tower for the period between 10:20 p.m. and 12:27 a.m., the timeframe in which the shooting took place.

years to life, consisting of 25 years to life for the murder conviction and 25 years to life for the greater firearm enhancement.[6]

III

DISCUSSION

A. *The Trial Court Did Not Commit Prejudicial Error by Limiting Espino's Cross-Examination of Gomez*

On appeal from the judgment of conviction, Espino claims the trial court abused its discretion under Evidence Code section 352 and violated his rights under the Confrontation Clause by precluding him from cross-examining Gomez about whether he was aware that Demetri had two prior criminal convictions. Espino sought to elicit the testimony to bolster his theory that Demetri—not Espino—was Lopez's killer, Gomez was afraid of Demetri because Demetri had a criminal history, and Gomez's fear provided him a bias and motive to falsely identify Espino as the killer. Although we agree with Espino that the court erred as a matter of state law, we conclude the error was harmless. Further, we reject Espino's argument that the limitations imposed on his cross-examination of Gomez violated his rights under the Confrontation Clause.

  1. *Additional Background*

A central disputed issue at trial concerned the identity of the presumed killer—the person who exited the driver seat of the car, walked to Joycee's before the shooting, and ran back to the car after gunfire erupted. The prosecution theorized the person in question was Espino, while the defense posited that the person was Demetri. To support its theory, the prosecution relied on the testimony of Gomez, who—in both his post-arrest interview with police and at trial—identified Espino as the presumed killer. The defense, in

---

[6]   The trial court stayed punishment for the lesser firearm enhancements.

9

turn, tried to persuade the jury that Gomez had falsely identified Espino as the presumed killer because Gomez was afraid of Demetri.

To that end, the defense filed a motion in limine seeking to admit third-party culpability evidence, including evidence that Demetri could have been the killer and evidence that Gomez was frightened of Demetri. Relevant here, the defense sought admission of two prior criminal convictions suffered by Demetri—a 2003 conviction for armed robbery and a 2020 conviction for narcotics possession for purposes of sale. The defense sought to admit the convictions, in part, to show that Gomez was aware of the convictions and feared Demetri because of them. Additionally, the defense sought to admit Demetri's prior convictions as impeachment evidence.

The People, for their part, moved in limine to exclude third-party culpability evidence, subject to an evidentiary hearing under Evidence Code section 402. They also sought to exclude Demetri's robbery conviction as impeachment evidence based on its remoteness in time.

Ruling on the motions in limine, the trial court allowed the defense to impeach Demetri with both of his prior criminal convictions. Further, the court permitted the defense to discuss third-party culpability in its opening statement and reserved a ruling on whether third-party culpability could be discussed during closing arguments, "depend[ing] on the evidence as it comes out."

These issues arose again during the defense's cross-examination of Gomez. During the cross-examination, the defense asked Gomez whether he was afraid of Espino or had ever been afraid of him. Gomez replied "No" to both questions. Then, the defense asked whether Gomez was afraid of Demetri, to which Gomez replied, "No." The defense followed up by asking if Gomez was familiar with Demetri's "past at all." Gomez stated he "heard

10

about it," and the court sustained a relevance objection to the question. The defense then asked Gomez if he knew whether Demetri had a prior criminal history and the court sustained another relevance objection before the witness could answer. An off-the-record sidebar ensued.

During the next break in the proceedings, outside the presence of the jury, the trial court summarized the sidebar for the record as follows:

> "We had an off the record sidebar discussion related to the issue of questioning Mr. Gomez if he was aware of [Demetri's] criminal history. [¶] The court during that sidebar conversation asked defense counsel if there was any offer of proof after Mr. Gomez denied, indicated that he was not afraid of [Demetri] or asked for an offer of proof of any other evidence that would demonstrate that fear. Quite frankly, the court also – I did explicitly discuss it during the chambers discussion about – as it related to [Evidence Code section] 352 in terms of the appearance of Mr. Gomez's knowledge of that at this time. [¶] And so the plan as I understood it, [defense counsel] is going to request to have Mr. Gomez subject to recall so that if this particular information comes out, she may be able to ask him that question if there is something that makes it appear more relevant and change that [Evidence Code section] 352 balance."

On redirect, Gomez repeated that he was not afraid of Espino or Demetri, and testified that he had no reason to be afraid of Demetri.

Thereafter, Demetri was called to the stand as a prosecution witness. At the outset of his direct examination, the prosecution elicited testimony from Demetri concerning his prior criminal convictions in anticipation that the defense would introduce the convictions as impeachment evidence.[7]

Demetri's prior criminal history arose again during closing arguments. In her closing argument, defense counsel argued Demetri was the shooter,

---

[7]    Demetri presented as a largely uncooperative witness at trial and claimed to have forgotten many of the details from the night of the shooting. However, he denied shooting Lopez, implying that Espino was the presumed killer.

11

not Espino. Defense counsel claimed Gomez—who had identified Espino as the presumed killer—was scared of Demetri because he had "a criminal history" and had "just gunned somebody down in the street over nothing." At that point, the court interrupted defense counsel, stated Demetri's criminal history was admissible for the limited purpose of evaluating his credibility, and noted there was no evidence Gomez was aware of Demetri's criminal history. Thereafter, the court instructed the jury to disregard the statement defense counsel had made about Demetri's criminal history.

      2. *Analysis*

We begin with Espino's claim that the trial court exceeded its authority under state law by limiting his cross-examination of Gomez on the topic of his awareness of Demetri's criminal past. As all parties agree, the trial court excluded the evidence pursuant to Evidence Code section 352. That section provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion." (*People v. Lewis* (2001) 26 Cal.4th 334, 374.)

Espino contends the court abused its discretion under Evidence Code section 352 because Gomez's knowledge about Demetri's prior convictions was probative of whether Gomez was afraid of Demetri and, if so, whether he had a bias and motive to falsely identify Espino as the presumed killer. Further, he argues the probative value of the evidence was not substantially outweighed by the countervailing considerations identified in Evidence Code section 352, which can in appropriate cases justify the exclusion of otherwise-

12

relevant evidence. While we are mindful that Evidence Code section 352 provides courts broad latitude to exclude impeachment evidence, we agree with Espino that, in this case, the court exceeded the scope of its discretion.

As Espino notes, Gomez appeared to have a foundation to testify about his knowledge of Demetri's criminal conduct. When asked about his familiarity with Demetri's past, Gomez stated on the record that he had "heard about it." Further, evidence of Gomez's awareness of Demetri's criminal past had some probative value insofar as it tended to show that Gomez may have been afraid of Demetri (despite the fact he claimed he was unafraid). That potential fear, in turn, could have supplied Gomez a bias or motive to identify someone *other than* Demetri—Espino, as it turns out—as the killer. Thus, the evidence was probative, to some extent, of Gomez's credibility.[8] (See *People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1285 (*Castaneda-Prado*) [" 'A party can offer evidence, by proffered extrinsic evidence or by cross-examination of a witness, to attack the credibility of a witness, if such evidence tends reasonably to establish that the witness has a motive to fabricate, or some other motive, that tends to cause the giving of untruthful testimony, even though there may be no reasonable basis for the existence of such a motive.' "]; see also *United States v. Abel* (1984) 469 U.S. 45, 52 ["Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."].)

On the other side of the Evidence Code section 352 ledger, the considerations justifying exclusion of the evidence were extremely weak and

---

[8] The People appear to impliedly concede the evidence had at least some relevance. In their appellate brief, they argue the evidence had "minimal probative value," not zero probative value.

13

did not substantially outweigh the probative value of the evidence. The cross-examination questions were limited in scope and would have consumed very little trial time. Further, in its rulings on the parties' motions in limine, the court admitted Demetri's prior convictions for use as impeachment evidence and the prosecution itself introduced the convictions in its direct examination of Demetri. Thus, there would have been little prejudice—and certainly not *undue* prejudice that *substantially outweighed* the probative value of the evidence—if the court had allowed the defense to briefly question Gomez about his knowledge of Demetri's prior convictions. (See *People v. Doolin* (2009) 45 Cal.4th 390, 439 ["The code speaks in terms of *undue* prejudice."].) As a result, we conclude the court exceeded its authority under state law when it restricted Espino's cross-examination of Gomez on this issue, which was at least somewhat probative of Gomez's bias and motive.

Having concluded the court violated state law, we turn to the distinct question of whether the court's rulings violated Espino's rights under the Confrontation Clause. "The Sixth Amendment to the United States Constitution, applicable to the states through the due process clause of the Fourteenth Amendment [citation], 'guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." ' " (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1279.) " '[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' " (*People v. Gonzalez* (2012) 54 Cal.4th 1234, 1265.) "Restrictions on the impeachment of witnesses do not violate the [C]onfrontation [C]lause when the jury would not have had a 'significantly different impression' of the witness's credibility had the proffered evidence been allowed." (*People v. Wilson* (2024) 16 Cal.5th 874, 925; see *People v.*

14

*Gonzalez* (2021) 12 Cal.5th 367, 406 [" ' " '[U]nless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility" [citation], the trial court's exercise of its discretion … does not violate the Sixth Amendment.' " ' "].)

On the record before us, we fail to see how the jury would have received a significantly different impression of Gomez's credibility if the proffered evidence had been allowed. The court permitted the defense to vigorously attack Gomez's credibility on a number of fronts, including his incentives to testify against his codefendant, Espino. Specifically, the defense questioned Gomez about his plea agreement with the district attorney, which allowed Gomez to escape liability for the murder charge if, in exchange, he testified as a witness for the prosecution in its case against Espino. The court also allowed the defense to cast doubt on Gomez's veracity by questioning him extensively about falsehoods he told on the night of the shooting and various inconsistencies related to his accounting of that night. For example, the defense cross-examined Gomez about his false statement to police that he remained home for the evening after Espino obtained money from his coworker. The defense also questioned Gomez about his efforts to deceive his father into believing he would remain home for the evening when in fact he planned to sneak out of the house and rejoin his companions.

Most importantly, the defense elicited third-party culpability evidence to show that Demetri was the true killer and Gomez was aware of this

alleged fact because he was nearby when the shooting happened.[9] Indeed, the defense argued to the jury, based on the evidence in the record, that Demetri "gunned somebody down in the street," and Gomez was "the person protecting him." Thus, the jury was presented with evidence and a defense narrative that Demetri perpetrated violent criminal behavior (against Lopez), Gomez was aware of Demetri's criminal conduct (because he was present for it), and the shooting made Gomez feel, in his own words, "really, really scared." Assuming the prohibited cross-examination would have adduced *further* evidence that Gomez was aware of *other* criminal conduct perpetrated by Demetri, it would have served a cumulative role and would not have painted a significantly different impression of Gomez's credibility. (See *People v. Lucas* (2014) 60 Cal.4th 153, 272 ["Given the jurors' knowledge that [the witness] already was actively trying to avoid prosecution for two murders and a potential sentence of death, evidence of his financial interest in defendant's conviction would not have produced a 'significantly different impression' of [the witness'] credibility"], disapproved on another ground by *People v. Romero and Self* (2015) 62 Cal.4th 1, 54, fn. 19; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 208 ["the additional impeachment value of the excluded evidence was minimal in relation to the major areas of impeachment already raised by the admitted evidence, and a reasonable jury would not have received a significantly different impression of [the witness'

---

[9] To take one example, the court allowed the defense to elicit testimony from its expert witness, Dr. O'Connor, that a patient suffering from Demetri's knee injuries would not necessarily exhibit an abnormal gait while running. The defense elicited the testimony to show Demetri was physically capable of running back to Espino's car after the shooting without any obvious visible impairment, just as the presumed killer is shown doing in the surveillance footage that was played for the jury.

credibility even if the excluded evidence had been admitted"].) Thus, Espino has not established a violation of his rights under the Confrontation Clause.

Because the trial court's evidentiary ruling violated state law, but did not impinge upon Espino's federal constitutional rights, we review the error for prejudice using the traditional standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Hin* (2025) 17 Cal.5th 401, 482.) "This requires us to examine whether it was 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Johnson* (2022) 12 Cal.5th 544, 611.)

Applying the *Watson* test, we conclude the error was harmless. Evidence of Gomez's knowledge about Demetri's prior criminal convictions would have had some relevance to the case, as described above, because it would have had some tendency to show he had a bias or motive to falsely identify Espino as the presumed shooter. However, the probative value of the evidence was limited by the fact that Gomez repeatedly testified he was unafraid of Demetri. It was further limited by the fact that the court allowed the defense to forcefully attack Gomez's credibility through a variety of means, including by highlighting his self-interested incentives to identify Espino as the presumed shooter. Further, as just discussed, the court admitted other evidence tending to show that Gomez was physically present for at least one violent criminal act that—if the defense's narrative was to be believed—Demetri perpetrated (the shooting of Lopez). Thus, the excluded testimony would have been somewhat cumulative of other evidence tending to show that Gomez was aware Demetri had engaged in criminal conduct.

The prosecution's case against Espino was also very strong. As noted, Gomez consistently identified Espino as the presumed shooter, both in his recorded interview with the police and at trial. Indeed, he identified Espino

17

as the shooter before he received the benefit of any plea agreement with the district attorney and despite his close friendship with Espino. Surveillance footage also depicted a car matching the appearance of Espino's Lexus as it parked around the corner from the crime scene just before the shooting. It showed two individuals exiting the car and one of them (the person who exited the driver seat) walking towards the crime scene immediately before gunfire erupted, while the second person (Gomez), engaged in conduct consistent with the role of a lookout person and a getaway driver.

There was also evidence that Espino had a strong motive to shoot Lopez. (See *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017 [" '[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence' "].) Espino lost a sizable bet to Lopez while playing pool with him earlier that night. Although Espino's companions settled the debt by handing most of Demetri's money over to Lopez, Espino repaid Demetri by using the money he borrowed from his coworker. Espino thus had a strong motive to shoot Lopez, either as a retaliatory measure for Lopez having beat him at pool or potentially to try to recover the money his companions had given Lopez. By contrast, Demetri did not have a strong motive to shoot Lopez because he had already been repaid in full.

There was strong DNA evidence linking Espino to the crime as well. As discussed, the surveillance footage showed the presumed killer exiting the driver side of the car and walking towards the crime scene. DNA testing of swabs from the driver's side interior door handle and seatbelt clip of Espino's Lexus showed DNA strongly consistent with Espino and Gomez—but not Demetri. Further, testing was performed on a medical face mask recovered from the ground near where the car was parked and it revealed DNA

18

consistent with Espino's DNA, suggesting he may have inadvertently dropped the mask as he exited the car to commit the murder.

Finally, the prosecution introduced convincing evidence of Espino's consciousness of guilt. (See *People v. Flinner* (2020) 10 Cal.5th 686, 719 ["a defendant's efforts to suppress harmful evidence can be probative of the defendant's consciousness of guilt"].) The prosecution introduced into evidence a recorded jailhouse conversation in which Espino urged his coworker—the coworker who gave Espino money and offered to bring him "the bitch"—to lie to the police by telling them "the bitch" referred to the coworker's girlfriend, rather than a gun. Additionally, the prosecution introduced a text message that Espino sent his coworker after the shooting, which included a shushing emoji and the statement, "Nothing to no one."

In light of this highly persuasive evidence of Espino's guilt, we conclude it is not reasonably probable Espino would have obtained a more favorable outcome if the court had allowed him to cross-examine Gomez about his knowledge of Demetri's prior criminal convictions.

B. *The Trial Court Did Not Commit Prejudicial Instructional Error*

Next, Espino argues the court erroneously instructed the jury regarding its consideration of accomplice testimony. At trial, the court instructed the jury to decide whether Gomez was an accomplice to the murder and, if the jury found he was an accomplice, to rely on incriminating testimony from Gomez to convict Espino only if Gomez's testimony was supported by independent corroborating evidence.[10] The court did not

---

10    Specifically, the trial court instructed the jury with CALCRIM No. 334, which stated, in relevant part:

provide an analogous accomplice corroboration instruction with respect to Demetri.  On appeal, Espino argues the court erred by failing to provide a sua sponte accomplice corroboration instruction for Demetri.

"Section 1111 bars any conviction predicated on 'testimony of an accomplice unless it [is] corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1155 (*Johnsen*).)  "The reason for the rule is manifest:  'Of course, an accomplice has a natural incentive to minimize his

---

"Before you may consider the statement or testimony of George Gomez, III, as evidence against Isak Espino, you must decide whether George Gomez, III, was an accomplice to that crime.  A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against Isak Espino.  Someone is subject to prosecution if: [¶] 1. He or she personally committed the crime; [¶] OR [¶] 2. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime. [¶] The burden is on Isak Espino to prove that it is more likely than not that George Gomez, III, was an accomplice."

[¶] ... [¶]

"If you decide that George Gomez, III, was not an accomplice, then supporting evidence is not required and you should evaluate his statement or testimony as you would that of any other witness. [¶] If you decide that George Gomez, III, was an accomplice, then you may not convict Isak Espino of Murder based on his statement or testimony alone.  You may use a statement or testimony of an accomplice that tends to incriminate Isak Espino to convict Isak Espino only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect Isak Espino to the commission of the crime."

own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others.' " (*People v. Mackey* (2015) 233 Cal.App.4th 32, 122; see also *People v. Jones* (2018) 26 Cal.App.5th 420, 438 ["Section 1111 'reflects the Legislature's determination that " 'because of the reliability questions posed by' " accomplice testimony, such testimony " 'by itself is insufficient as a matter of law to support a conviction.' " ' "].)

"An accomplice is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citation.] 'To be chargeable with an identical offense, a witness must be considered a principal under section 31.' " (*Johnsen, supra*, 10 Cal.5th at p. 1155.) "That section defines principals as '[a]ll persons concerned in the commission of a crime, whether ... they directly commit the act constituting the offense, or aid and abet in its commission ....' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 472, quoting section 31; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 429 [" ' "In order to be an accomplice, the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33)." ' "].)

" '[W]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration." (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) "Only when there is 'substantial evidence that a witness who has implicated the defendant was an accomplice' must the trial court instruct on 'the principles regarding accomplice testimony.' [Citations] ' "But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that

21

situation, need not instruct the jury on accomplice testimony." ' " (*Johnsen, supra*, 10 Cal.5th at p. 1155.)

We need not determine whether the trial court should have included Demetri within the accomplice corroboration instruction it provided to the jury because any possible error was harmless. Instructional error of the kind alleged "is harmless if the record contains 'sufficient corroborating evidence.' [Citation.] 'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 95.)

The record before us contains ample corroborating evidence. In addition to the testimony of Gomez, who consistently identified Espino as the presumed killer, the record includes: (1) surveillance footage showing a car resembling Espino's Lexus parked around the corner from the crime scene at the time of the killing; (2) evidence that Espino's DNA—but not Demetri's DNA—matched DNA found on the driver seat of Espino's car; (3) a medical face mask found on the ground near the crime scene, which had DNA on it that was consistent with Espino's DNA; (4) evidence that Espino had a strong retaliatory and financial motive to kill the victim; (5) a text message Espino sent his coworker asking for a firearm on the night of the murder; (6) evidence that Demetri had a knee injury at the time of the murder, which tended to exculpate him due to the fact that the presumed killer was captured on surveillance footage running without any visible physical impairment; (7) a recorded jailhouse conversation in which Espino urged his

22

coworker to lie to the police about whether Espino had asked him for a gun before the murder; and (8) a text message Espino sent his coworker after the murder tending to show that Espino harbored a consciousness of guilt.

On this record, any error in the court's failure to include Demetri within the accomplice corroboration instruction was harmless.

C. *The Abstract of Judgment Includes a Clerical Error*

Finally, Espino argues the abstract of judgment includes a clerical error that requires correction. The People agree, and so do we.

The abstract of judgment includes checkmarks under Item 8 indicating that Espino was sentenced pursuant to the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12). However, as Espino correctly notes, the prosecution never alleged he suffered prior serious or violent felony convictions. Further, the court did not invoke the sentencing principles contemplated by the Three Strikes law when it sentenced Espino to prison for 50 years to life.

The abstract of judgment is a contemporaneously prepared "clerical record of the conviction and sentence." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070, italics omitted.) "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) "As with other clerical errors, discrepancies between an abstract and the actual judgment as orally pronounced are subject to correction at any time, and should be corrected by a reviewing court when detected on appeal." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.)

To achieve consistency with the oral pronouncement of judgment, the abstract of judgment must be amended by deleting the checkmarks under Item 8 indicating that Espino was sentenced under the Three Strikes law.

23

IV

DISPOSITION

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment deleting the checkmarks under Item 8 (which mistakenly indicate that Espino was sentenced under the Three Strikes law) and deliver the amended abstract of judgment to the Department of Corrections and Rehabilitation.

McCONNELL, P. J.

WE CONCUR:

BUCHANAN, J.

KELETY, J.